IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER SEVEN |
| LMcD, LLC,<br>a/k/a ICE 4 U 2 C, | : | BANKRUPTCY NO.: 5-05-bk-54237 |
| DEBTORS | : | |
| WILLIAM G. SCHWAB, TRUSTEE<br>PLAINTIFF | : | {**Nature of Proceeding**: Complaint to Pierce the Corporate Veil} |
| vs. | : | |
| KEVIN McDONALD<br>HELEN McDONALD | : | {*Consolidated adversary proceedings*} |
| DEFENDANTS | : | **ADVERSARY NO.: 5-07-ap-50007** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| WILLIAM G. SCHWAB, TRUSTEE<br>PLAINTIFF | : | {**Nature of Proceeding**: Complaint to Pierce the Corporate Veil or in the Alternative to Avoid and Recover Fraudulent Conveyance} |
| vs. | : | |
| DAMENTI'S, INC., | : | |
| DEFENDANT | : | **ADVERSARY NO.: 5-07-ap-50098** |

# OPINION

Kevin McDonald is a restaurateur, businessman, chef, and master ice carver. These talents have led him to significant successes in many fields. Unfortunately, his skills could not rescue him from a rather unique venture known as "ICE 4 U 2 C." This entity was a trade name for LMcD, LLC. ICE 4 U 2 C's sole effort, in its rather short history, was to conduct a demonstration of the artwork of the world's most talented ice carvers. These ice carvers gathered in Forty Fort, Pennsylvania, to ply their craft and illustrate their artwork to the members of the public who paid admission and ventured past this marvelous collection.

Kevin McDonald worked as a chef for one of Luzerne County's most well-known

eateries, Damenti's Restaurant. Some years later, in 1977, McDonald purchased the restaurant from the then owners but retained the restaurant name. In 1989, he incorporated the restaurant and divided the stock between himself and his spouse, Helen.

McDonald had been trained as a master ice carver in his early years during his employment out of state. In 1993, he decided to embellish the success of his current restaurant with a small display of ice carving art as a seasonal attraction on property adjacent to Damenti's. Year after year that display grew in size and popularity. In 2004, McDonald decided to take the ice display to a higher level. He formed a "for profit" limited liability company (LLC), known as LMcD, for the purpose of showcasing the artistry of various tradesman. LMcD filed for a fictitious name with the State of Pennsylvania for the appellation "ICE 4 U 2 C" on October 25, 2004. The maiden venture would be the 2005 presentation of ICE 4 U 2 C. Unfortunately, the show was not the success that McDonald had hoped. A significant amount of debt was incurred, far in excess of the revenues generated primarily by admission fees and donations. LMcD found itself in voluntary Chapter 7.

William Schwab was appointed Chapter 7 Trustee for LMcD. After an investigation of the affairs of the company, he initiated lawsuits against Kevin McDonald and his wife, Helen (Adv. No. 5:07-50007), and Damenti's Inc. (Adv. No. 5:07-50098). His theories of liability are founded on the rather loose operations of LMcD and its principal, Kevin McDonald. His argument is that LMcD, as a limited liability company, can be "pierced" in order to seek liability against its members, Kevin and Helen McDonald. The Trustee argues that LMcD and the McDonalds are "alter egos" of each other and are jointly liable for the debts of LMcD. The Trustee further states a claim that the McDonalds' corporate interest in Damenti's Restaurant, Inc. can be "reverse pierced" so as to also hold Damenti's Restaurant liable for the debts of the share holders, Kevin and Helen McDonald, "alter egos" of LMcD. Additionally, the Trustee

argues the single entity theory, or the enterprise theory[1], in attempting to impose liability on both LMcD and Damenti's Restaurant since they, arguably, advanced the ice show on a joint basis. The final theory advanced by the Trustee is based on quantum meruit, who argues that Damenti's restaurant received significant promotional advantage from the ice show for which it should compensate the Debtor.

Much of the Trustee's case centered around the array of ostensible LMcD trade creditors whose billing statements were indefinite as to obligor. Compounding that situation was the prominent role that Damenti's Restaurant played in "sponsoring" the ice show with much of the promotional material bearing the name "Damenti's presents ICE 4 U 2 C."

I find that a key component of the Trustee's argument was the fact that Kevin McDonald unquestionably utilized his personal line of credit in funding the cash requirements of Damenti's Restaurant and LMcD. In turn, Damenti's Restaurant would further advance the cash requirements of LMcD. As a case in point, McDonald admitted that neither LMcD, nor Damenti's Restaurant, possessed a credit card in their names. All credit card purchases were made on the personal credit card of Kevin and Helen McDonald. Charges attributed to Damenti's Restaurant, LMcD, and the McDonalds were then identified and checks were drawn to the credit card company from the McDonalds, for their personal charges, and Damenti's Restaurant to pay the credit card bill. Damenti's would pay its own assessed portion as well as the LMcD share. Damenti's would actually advance the payment on behalf of LMcD and anticipate reimbursement from LMcD. I mention these facts because they play a pivotal role in discussing the legal issues which are dispositive of the litigation.

---

[1] "Under that theory, two or more corporations are treated as one because of identity of ownership, unified administrative control, similar or supplementary business functions, involuntary creditors, and insolvency of the corporation against which the claim lies." *Miners, Inc. v. Alpine Equipment Corp.*, 722 A.2d 691, 695 (Pa.Super. 1998).

*I. Piercing the Veil of LMcD, LLC.*

LMcD was created under the Pennsylvania Limited Liability Company Law of 1994. 15 Pa.C.S.A. § 8901 et seq. Under that law, much like corporate stockholders, members are not typically liable for the obligations of the company. 15 Pa.C.S.A. § 8922. Nevertheless, the Committee Comment to 15 Pa.C.S.A. § 8904(b) makes clear that the equitable remedy of "piercing" is available regarding an LLC.

In Pennsylvania there is a strong presumption against piercing the veil. *See, Lumax Indus., Inc. v. Aultman*, 543 Pa. 38, 669 A.2d 893, 895 (1995). There is no definitive standard in Commonwealth law for the application of this theory, but the typical argument states that it is appropriate to pierce the veil in order to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat the public purpose or shield someone from a liability for a crime." *Village at Camelback Property Owners Assn. Inc. v. Carr*, 371 Pa.Super. 452, 461, 538 A.2d 528, 533 (Pa.Super. 1988)(citing *Zubik v. Zubik*, 384 F.2d 267 (3d Cir. 1967)). The factors to be considered in disregarding the corporate form are said to be undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, and use of the corporate form to perpetuate a fraud. *Lumax*, 669 A.2d at 895.

*Undercapitalization*

The United States Supreme Court has recognized the vulnerability created by the undercapitalization of an entity. *Anderson v. Abbott*, 321 U.S. 349, 365, 64 S.Ct. 531, 539, 88 L.Ed. 793 (1944). The law of the Commonwealth provides little guidance as to what constitutes undercapitalization. *See, Fletcher-Harlee Corp. v. Szymanski,* 936 A.2d 87, 100 n.17 (Pa.Super. 2007). Capital is defined as "[o]wners' equity in a business." *Black's Law Dictionary* 208 (6th ed. 1990). While the record was somewhat unclear as to the exact capital investment of the

McDonalds, I find the record supports a capital contribution of $25,000.

At trial, the defense expert testified that, at the very least, the Debtor's initial capital should have been 10% of its debts. (Transcript of 7/31/2007 at 228.) That would calculate to be about $30,000.[2] The Trustee suggested that the capitalization of the Debtor should have been 20-25% of the debts incurred given the short length of operation. *Id*. at 42. Using either of these formulas results in a finding that the Debtor was not "adequately" capitalized. Even so, undercapitalization alone is not dispositive in this case. *Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 680 (6th Cir.2006); *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 961 (7th Cir.1999); *Gartner v. Snyder*, 607 F.2d 582, 588 (2d Cir.1979). But see, *Nilsson Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538, 1544 (9th Cir.1988). Without additional findings, this Court will not pierce the veil.

### *Failure to Adhere to Company Formalities/Absence of Company Records*

Another element to consider when piercing the veil is the failure to adhere to company formalities. Not every disregard of formalities justifies piercing the veil, but deviations should be considered in the overall picture. *Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC et al.*, 846 A.2d 1264 (Pa.Super. 2004). In the case of a limited liability company, such as the Debtor , the requirements are less stringent. Mark C. Larson, *Piercing the Veil of Pennsylvania Limited Liability Companies*, 75 Pa. B.A. Q. 124 (2004). Despite the flexibility of a limited liability company, the members are still required to adhere to some formalities in running a limited liability company.

Entered into evidence was the Certificate of Organization of the LLC, dated October 8, 2004 (M-1); the Limited Liability Operating Agreement dated October 12, 2004 (M-2); the registration of the fictitious name, ICE 4 U 2 C, filed October 25, 2004 (M-3); the Application

---

[2] Bankruptcy Schedule F identifies unsecured liabilities of $303,076.69.

for Employer Identification Number (M-5) dated October 25, 2004; a document establishing a bank account for ICE 4 U 2 C dated October 18, 2004[3] (M-6); a commercial lease with LMcD dated January 11, 2005 (M-7); a Certificate of Occupancy issued to "Kevin McDonald DBA LMcD, LLC" dated January 18, 2005 (M-8); and a license to Operate a Public Eating and Drinking Place issued to ICE 4 U 2 C dated February 20, 2005 (M-9). Also submitted were various tax returns filed by LMcD (M-16, 17, 21, and 22). The McDonalds also maintained separate books for the Debtor.

The conclusion is inescapable that LMcD well documented its fundamental dealings with the government in its short business life.

### *Substantial Intermingling of Personal and Corporate Affairs*

The Trustee argues that the evidence presented at trial and admissions made by the defense support a finding that there was a substantial intermingling of personal and corporate affairs.

Undoubtedly, Kevin McDonald was lax about identifying himself as a member of an LLC when dealing with creditors. The question becomes whether McDonald forfeited the protections of the Limited Liability Act by his casual attention to his membership position. I tend to think not. As an example, McDonald was primarily liable on the credit charges he made for Damenti's and LMcD, even though he directed that each entity pay their share. The creditors were not harmed by this procedure. In fact, they may have benefitted by having two entities liable for the same obligation where usually there would be but one. If Kevin McDonald arranged for services or materials for LMcD without disclosing his position with the LLC, then he should be primarily liable. He cannot later argue that he was a mere "agent" for LMcD.

At the time of trial, the Trustee submitted numerous examples of what he perceived was

---

[3] Admittedly predating the registration of the fictitious name.

the "commingling" of assets. Commingling is the "fiduciary's mixing of personal funds with those of a beneficiary or client." *Black's Law Dictionary* (8th ed. 2004). The Trustee did not cite one example of LMcD funds being deposited in a personal account of McDonald or Damenti's Restaurant. Rather, the Trustee referred to numerous situations where McDonald or Damenti's Restaurant simply paid for bills that were incurred by LMcD. This is not commingling of assets by LMcD. Instead of loaning the Debtor the funds to pay for necessities, the McDonalds bypassed the LLC and made the payments directly. (Transcript of 8/7/07 at 206.) The McDonalds used money from their personal account to pay for rent, the liquor license, and some bills, all paid in cash. *Id*. Furthermore, the McDonalds used their personal credit cards to make purchases for the Debtor. Instead of reimbursing the McDonalds for purchases they made, Damenti's paid for the credit card purchases made for the restaurant and ICE 4 U 2 C. (Tr. of 7/31/07 at 161.)

Additionally, the invoices for supplies and services purchased by the Debtor indicate that many of those doing business with the Debtor could not differentiate between LMcD, Damenti's, and the McDonalds. Despite testimony from the defense that they did their best to ensure that everyone knew they were dealing with the Debtor, (Tr. of 7/31/07 at 140-41), the intermingling of identities, starting early in the venture, clearly confused some of the vendors. *Id*. at 126. Kevin McDonald admits that some of this was done intentionally for more successful advertising. (Tr. of 8/7/07 at 182-83.) Although confusion over the identities of the recipients of goods and services can be attributed to the vendors' prior dealings with Kevin McDonald or Damenti's Restaurant, *(Id.* at 133), it does not explain why or how vendors from out of the area, who had no prior association with Kevin McDonald or Damenti's, concluded that they were doing business with Damenti's or Kevin McDonald in spite of Kevin McDonald's assertions that he explicitly told them otherwise. *Id*. at 169. It should be noted, however, that McDonald's use

of the fictitious name, ICE 4 U 2 C, should have alerted vendors that state records could be examined to determine the party in interest. The very purpose of the Pennsylvania Fictitious Name Act, 15 Pa.C.S.A. § 301 et seq., is to protect those dealing with an assumed name so as to enable them to know with whom they do business. *Rowland v. Canuso*, 329 Pa. 72, 79, 196 A. 823, 827 (1938).

While there may have been an intermingling of identities, there appears to be no evidence of the commingling of assets, financial records, or employees. I believe this factor weighs against piercing the LLC.

*Use of the Corporate Form to Perpetrate a Fraud*

The elements required for a finding of fraud are: (1) a false representation of fact made by the maker; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) action in reliance thereupon by the recipient; and (5) damage resulting to the recipient from such misrepresentation. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 464 A.2d 1243 (1983). Although the McDonalds may not have formed the Debtor with the intent to perpetrate a fraud, they are alleged to have misled participants and vendors with regard to the identity of the company with whom they did business. (*See,* P-19.) The Trustee argues that potential participants and creditors were notified that Damenti's ICE 4 U 2 C was hosting an exhibition run by Kevin McDonald through a letter written and mailed by Kevin McDonald. (P-21)[4] The Trustee argues that this solicitation demonstrated the "confusion" created by Kevin McDonald as he organized the event. To the contrary, a review of this correspondence repeats, on multiple occasions, the statement that ICE 4 U 2 C will be the funding vehicle for the event. For example, it states, "ICE 4 U 2 C has secured . . . [a facility]."

---

[4] Erroneously referred to as Plaintiff's Exhibit 20 in Transcript of 7/31/07 at 150.

"ICE 4 U 2 C is willing to provide payment for travel expenses." "ICE 4 U 2 C will negotiate a daily rate with each carver." "ICE 4 U 2 C will turn this into a yearly ice carving convention . . . ." Kevin McDonald testified at trial that he intended to garner support for this exhibition by using the names of Kevin McDonald and Damenti's Restaurant. (Tr. of 8/707 at 182-83.)

Some vendors apparently were not told specifically who the recipient of their goods and services was and assumed that it was either Damenti's or Kevin McDonald. I find that there may have been a lack of sufficient communication by Kevin McDonald or ICE 4 U 2 C volunteers as to billing information prior to delivery. Having said that, though, does not make the case for the Trustee. McDonald or Damenti's could very well be liable for these obligations directly as the contracting party. Making the leap to the alter ego/piercing conclusion requires much more than is present on this record. LMcD did uphold its LLC form. It did have a membership agreement. It did register its fictitious name. It maintained separate books and filed tax returns. It had a bank account and did not deposit funds earmarked for personal use into that account. While the McDonalds may not have run their businesses strictly separate, these facts do not seem to overcome the strong presumption against piercing. See, for example, *718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein)*, 192 F.3d 88, 100 (3d Cir.1999).

## II. Reverse Piercing the McDonalds to Reach Damenti's

Since the McDonalds have not been found to be personally liable for the debts of the Debtor, liability cannot be extended to Damenti's by a reverse piercing of the corporate veil. "In a 'reverse' piercing, assets of the corporate entity are used to satisfy the debts of a corporate insider so that the corporate entity and the individual will be considered one and the same." *In re Mass*, 178 B.R. 626, 627 (M.D.Pa. 1995).

In order for this Court to reverse piercing the corporate veil of Damenti's, the same elements required to pierce the corporate veil must be met including: undercapitalization,

absence of corporate records, failure to follow corporate formalities, substantial intermingling of corporate and personal affairs, and the use of the corporate form to perpetrate a fraud. The Trustee did not present sufficient evidence to justify a reverse piercing of the corporate veil, even had he prevailed in establishing personal liability on the part of the McDonalds. First, no evidence was presented to show that Damenti's failed to keep records or that it failed to follow corporate formalities. In fact, the only mention of Damenti's records was received from Ms. Schreibmaier, the Debtor's bookkeeper, who testified that she temporarily filled in for the Damenti's bookkeeper prior to the formation of the Debtor. (Tr. of 8/7/07 at 129.) Additionally, except for the use of the personal credit card of the McDonalds, there was no evidence to indicate a substantial intermingling of Damenti's corporate affairs and the McDonalds' personal affairs or that there was a siphoning of funds. Although Damenti's did pay portions of the McDonald's credit card bills, it was established and undisputed at trial that they were paying for the purchases made for the restaurant and not the McDonalds' personal expenses. *Id.* at 24-5. Finally, there is no evidence that the McDonalds used the corporate form to perpetrate a fraud. Damenti's is, apparently, a highly successful and reputable business that has been operating for over thirty years. *Id.* at 160.

Given the strong presumption against piercing the corporate veil in Pennsylvania and the lack of evidence regarding the corporate practice of Damenti's, this Court will not reverse piercing the corporate veil to extend the liability for Debtor's debts to Damenti's.

### III. *Single Entity Theory*

Another way to extend liability to Damenti's is via the single entity or enterprise entity theory. The single entity theory is applicable where "two or more corporations share common ownership and are, in reality, operating as a corporate combine." *Miners Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 695 (Pa.Super. 1998). The single entity theory has not yet been adopted by

the Commonwealth of Pennsylvania. I don't believe that fact bars me from attempting to determine how the Pennsylvania Supreme Court would address the issue should it hear such a case. The single entity theory is a theory of recovery. This type of topic has been reviewed by the federal court in an attempt to ascertain Pennsylvania law (In the area of tort law, see *Habecker v. Clark Equipment Co.*, 36 F.3d 278, 284 (3d Cir.1994), *cert. denied*, 514 U.S. 1003, 115 S.Ct. 1313, 131 L.Ed.2d 195 (1995)). Since the Pennsylvania Supreme Court has not spoken on this issue, I believe it would be incumbent on this Court to predict how that court would resolve the issue. *Dilworth v. Metro. Life Ins. Co.*, 418 F.3d 345, 349 (3d Cir.2005). The single entity theory is a theory of recovery which is the subject matter for such a review.

In making this analysis, this Court should examine the following criteria:

> (1) what the Pennsylvania Supreme Court has said in related areas; (2) the "decisional law" of the Pennsylvania intermediate courts; (3) opinions of federal courts of appeals and district courts applying state law; and (4) decisions from other jurisdictions that have discussed the issues we face here.

*Dilworth*, 418 F.3d at 349.

The only high state court to discuss the single entity theory, the Illinois Supreme Court, has set out a two prong test.[5] As stated in *Main Bank of Chicago v. Baker,* 86 Ill. 2d 188, 205, 427 N.E.2d 94, 102 (1981), for the separate identity of the corporate entities to be disregarded, "it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of the separate existence would, under the circumstances, sanction a fraud or promote injustice." *See*

---

[5] A Texas intermediate court has suggested that there are a myriad of considerations to be weighed before liability attaches, i.e., "(1) common employees; (2) common offices; (3) centralized accounting; (4) payment of wages by one corporation to another corporation's employees; (5) common business name; (6) services rendered by the employees of one corporation on behalf of another corporation; (7) undocumented transfers of funds between corporations; and (8) unclear allocation of profits and losses between corporations." I view these factors as non-exclusive elements of the "two prong" test.
*Hoffmann v. Dandurand,* 180 S.W.3d 340, 348 (Tex.App.-Dallas, 2005).

*also, Las Palmas Assocs. v. Las Palmas Ctr. Assocs.,* 235 Cal. App. 3d 1220 (1991)*; In re New Orleans Train Car Leakage Fire Litig.*, 690 So. 2d 255 (La.App. 4 Cir. 1997)(discussing the elements required for a finding of a single enterprise).

The Pennsylvania Superior Court has also considered this issue, but made no ruling on the validity of this theory since the requisite elements were not met anyway. *Miners*, 722 A.2d at 695. Additionally, the District Court for the Eastern District of Pennsylvania has declined to apply the single entity theory because it has not yet been adopted by the Commonwealth. *E-Time System, Inc. v. Voicestream Wireless Corp.,* 2002 U.S. Dist. LEXIS 15568 (E.D.Pa. 2002).

The Supreme Court of Pennsylvania might be reluctant to adopt the single entity theory given that the Commonwealth is hesitant to pierce the corporate veil in any case. *See, Lumax*, 669 A.2d at 895. However, the fact that Pennsylvania courts do pierce the corporate veil on occasion, to prevent fraud or injustice, indicates that they may be open to adopting the "single entity theory." Like the "alter ego theory" adopted by the Pennsylvania courts, the "single entity theory" might be used only when upholding the separate identities would permit fraud or injustices. *See*, *Main Bank of Chicago,* 86 Ill. 2d at 205. The Pennsylvania Supreme Court would likely adopt the "single entity theory" for the same limited purpose it chose to adopt the "alter ego theory," -- to prevent fraud or injustice. *See, Village at Camelback Property Owners Assn. Inc.*, 371 Pa.Super. at 461.

Pennsylvania recognizes the theories of "piercing." Our Third Circuit Court of Appeals, applying Pennsylvania law, has considered "reverse piercing." *In re DiLoreto,* 266 Fed.Appx. 140, 142, 2008 WL 227655, 1 (C.A.3 (Pa., 2008)), *In re Blatstein*, 192 F.3d 88 (3d Cir. 1999). Accordingly, the stage is set to embrace the single entity theory because the common corporation of two wholly owned affiliates is exposed, first to the parent by piercing, then back to the affiliate by reverse piercing. The very same theory would apply if the common owners were

individuals. This has been identified as "triangular piercing." *See* PCORPVL 1:9 *citing*, *Nursing Home Consultants, Inc. v. Quantum Health Services, Inc*., 926 F. Supp. 835 (E.D.Ark. 1996), *aff'd* 112 F.3d 513 (8th Cir. 1997).

In order for this Court to disregard the corporate form, the Trustee must satisfy the elements of the "single entity theory." The first three elements of the "single entity theory" are "unity of ownership," "unified administrative control," and "insolvency of the company against which the claims lie." *Miners*, 722 A.2d at 695. The Trustee has met his burden in satisfying all three of these elements. There is "unity of ownership" because the McDonalds are the sole owners of both Damenti's and the Debtor. (Tr. of 8/7/07 at 160.) *See also,* M-2. There is also "unified administrative control" as the McDonalds are the officers/members of both companies. *Id*. Additionally, the Debtor, against which the claims lie, is clearly insolvent and unable to meet its debts. (P-11 through 14)

Next, the Trustee must satisfy the involuntary creditors element of the "single entity theory." *Miners,* 722 A.2d at 695. Involuntary creditors are defined as "those who did not rely on anything when becoming creditors." Mary Elisabeth Kors, *Altered Egos: Deciphering Substantive Consolidation*, 59 U. Pitt. L. Rev. 381, 419 (Winter 1998). Tort victims are classic examples. *East End Memorial Ass'n v. Egerman,* 514 So.2d 38, 44 (Ala. 1987) (Voluntary creditors, on the other hand, are generally able to inspect the financial structure of a corporation and discover potential risks of loss before any transaction takes place.) The Debtor's creditors are not involuntary creditors in this sense because they chose to extend a line of credit.

Finally, the Trustee must satisfy the similar or supplementary business function element of the "single entity theory." *Miners,* 722 A.2d at 695. There is no clear definition of what the Court would consider to be a similar or supplementary business function, only that this is an element to be considered. For years, Damenti's, one economic entity, conducted both its

restaurant business and the ice shows. (Tr. of 8/7/07 at 165.) The fragmentation of the one economic enterprise into two business entities to perform the functions previously conducted by one entity appears, on its face, to satisfy the "similar or supplementary business function" element. Mary Elisabeth Kors, *Altered Egos: Deciphering Substantive Consolidation*, 59 U. Pitt. L. Rev. 381, 435-36 (Winter 1998). The Debtor took over one of the functions of the original economic entity thus fulfilling a "similar or supplementary business function."

On the other hand, the ice show may have borne the sponsorship name of "Damenti's," but it was no longer located on premises adjoining Damenti's Restaurant. Rather, the ice show was located approximately 13 miles from the restaurant.[6] While the ice show may have publicized the restaurant, attracting professional ice carvers or attendees to a location so removed could not have as direct an impact on patronage as would an adjoining attraction.

On a more direct note, the ice show has no supplemental value to a restaurant, such as food producer, winery, parking facility, entertainment facility, caterer, etc. Its linkage was remote, at best.

I find the Trustee has failed to satisfy all the elements of the single entity theory so that even if I were to predict that the Pennsylvania Supreme Court would embrace the single entity theory, the facts in this case would not be sufficient to hold Damenti's liable.

*IV. Quantum Meruit*

The doctrine of quantum meruit states that "a person who has been unjustly enriched at the expense of another is required to make restitution to the other." The elements necessary to prove unjust enrichment are:

> (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such

---

[6] The Court takes judicial notice of the driving distance from Mountaintop, Pennsylvania, the location of Damenti's Restaurant, and ICE 4 U 2 C, Forty Fort, Pennsylvania. Fed. R. Evid. 201.

circumstances that it would be inequitable for defendant to retain the benefit without payment of value.

*Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa.Super. 1999)(citations omitted).

The Trustee argues that Damenti's was unjustly enriched by the use of its name to promote the ice show. Damenti's received free publicity for the restaurant through its affiliation with the exhibition.

Defendant Damenti's argues that there is nothing unjust about the use of the Damenti's name in advertising ICE 4 U 2 C's exhibition. In support of this theory, the Defendant points to the college football bowl games that use corporate sponsorships. The Defendant argues that advertising Damenti's ICE 4 U 2 C is essentially the same as advertising the Tostito's Fiesta Bowl, the AllState Sugar Bowl, or the FedEx Orange Bowl. *(See,* Post Trial Memorandum of Law of Defendants at 8, n6 (Doc. #18).)

Although there would be nothing wrong with Damenti's sponsoring the event, the Defense failed to acknowledge the primary difference between Damenti's "sponsorship" of the ice show and the sponsors of the numerous bowl games: the Defendants admitted that Damenti's never paid anything or provided any comparable service to the Debtor in return for the publicity it received. (Tr. of 8/7/07 at 183.) Unlike Damenti's, the college bowl game sponsors pay a seven figure fee, which is included in the multi-million dollar payout received by the winning schools, in exchange for the millions of publicity the sponsor receives. *See generally, The History of the Orange Bowl* (visited July, 7, 2008)<http://www.orangebowl.org/ViewArticle.dbml?DB_OEM_ID=11800&KEY=&ATCLID=695751>.

Since Damenti's did not reimburse the Debtor for the benefit conferred, all the elements required for a remedy in quantum meruit are met. First, the Debtor provided Damenti's the benefit of the additional publicity that comes with a corporate sponsorship. Historically, Kevin

[K:\Cathy\Opinions-Orders filed 2009\5-07-ap-50007_LMcD_LLC.pdf]     15

Case 5:07-ap-50098-JJT    Doc 21    Filed 03/04/09    Entered 03/04/09 12:30:20    Desc
                          Main Document        Page 15 of 18

McDonald admitted that Damenti's enjoyed the perk of increased patronage and notoriety from being associated with the ice show. (Tr. of 8/7/07 at 196.)  Finally, Damenti's retained the free corporate "sponsorship" even though it was clear the Debtor was having difficulty meeting its financial burdens.  It was unjust for Damenti's to continue to accept the benefits of the sponsorship and expect a failing company to pay for both its own advertising costs and those of Damenti's without compensation.

Damenti's was unjustly enriched by the free publicity it received from its sponsorship of the Debtor's exhibition.  However, the burden falls on the Trustee to prove the reasonable value of this benefit.  *See, Pulli v. Warren Nat'l Bank*, 488 Pa. 194, 412 A.2d 464 (1979).  At no point did the Debtor offer any proof or evidence with regard to the reasonable value of a "corporate sponsorship."  The only mention of a value appears in the Trustee's brief, which only alleges that Damenti's should compensate the Debtor for the entire amount of the debt and does not mention the reasonable value of the services.  (Plaintiff Trustee's Post-Trial Brief at 19 (Doc. #19).)  Since the Trustee has failed to establish the reasonable value of this sponsorship, he is unable to recover on the basis of quantum meruit.

*V. Individual Exposure*

The general rule is that an agent who enters into a contract in his or her own name for an undisclosed principal, may be held personally liable by the other person to that contract.  3A Fletcher Cyc. Corp. § 1120, Personal liability as undisclosed agent for corporate principal (2008).  Regardless of the Trustee's efforts to pierce the Debtor LLC, Kevin McDonald's failure to sign in a representative capacity may moot the issue.  Pursuant to Pennsylvania law, the use of an individual signature, without indication that it is being signed in a representative manner, imports a personal liability.  *See, e.g., Watters v. DeMilio*, 390 Pa. 155, 159, 134 A.2d 671, 674 (1957); *Strauss v. Berman,* 297 Pa. 432, 435, 147 A. 85, 86 (1929); *Flexlume Corp. v. Norris,* 98

Pa. Super. 530, 532 (1929). Furthermore, the Trustee points to the fact that this principle has been recognized and codified by the Uniform Commercial Code:

> Except as otherwise established the name of an organization preceded or followed by the name and office of an authorized individual is a signature made in a representative capacity.

12A P.S. § 3-403(3).

*See also, Trenton Trust Company v. Klausman,* 222 Pa. Super. 400, 403, 296 A.2d 275, 277 (1972). The burden falls on the agent to disclose that he is acting in a representative capacity and not on the other party to discover it. *Flexlume Corp.,* 98 Pa. Super. at 532.

In this case there are instances of Kevin McDonald's failure to obligate the LLC in a representative capacity. Although most of the McDonalds' departures from corporate formalities were harmless and would not justify piercing the corporate veil, Kevin McDonald's dealing with creditors without identifying his agency relationship with LMcD or ICE 4 U 2 C warrants making him personally liable for certain debts of the Debtor.

Herein lies the fundamental fact in this case, i.e., the willingness of Kevin McDonald to extend his personal credit for the benefit of his varied enterprises. Just as Kevin McDonald was willing to use his personal credit card to fund Damenti's and LMcD, and his willingness to individually bind himself on written obligations to Eastern Penn Supply Company and A&R Building Supply Company, (M-26 and 27), I find that he extended his own personal credit to purchase trade goods and services as may be established regarding the various tradesman that dealt with LMcD. To the extent that these tradesman can establish McDonalds' or Damenti's liability for these debts, the tradesman are likely not creditors of the Debtor, LMcD.

*VI. Conclusion*

For the foregoing reasons, this Court finds in favor of the Defendants on the alter ego and single entity theories of piercing the corporate veil. Moreover, the Court declines to grant relief

on the theory of reverse piercing the corporate veil due to insufficient evidence, and on the theory of quantum meruit because the Trustee failed to prove the reasonable value of the sponsorship.

An Order will follow.

Date:   March 4, 2009

*John J. Thomas, Bankruptcy Judge*
(CMS)
*This opinion is electronically signed and filed on the same date.*